UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

| | |
|---|---|
| MARKEL INSURANCE COMPANY,<br><br>    Plaintiff,<br><br>v.<br><br>ORIGIN BANCORP, INC.,<br><br>    Defendant. | Bankr. No. 21-01001<br>Civ. No. 1:21-CV-151 |

## MEMORANDUM OPINION AND ORDER

The Lauren Corporation, an engineering and construction company, obtained a loan from Origin in 2013. In exchange, Origin obtained a perfected security interest in Lauren's accounts receivable. Years later, Lauren entered into an agreement with Markel for surety bonds, which included a provision giving Markel a security interest in Origin's accounts receivable and another allegedly placing certain accounts receivable in a trust for the benefit of Markel. In 2021, Lauren defaulted on the Origin loan. Acting pursuant to its agreement, Origin seized the funds in Lauren's bank account. Lauren then filed for bankruptcy.

Now, the parties dispute who is entitled to the accounts receivable. Both have filed motions for summary judgment. Alleging that a trust had been established, which would shield the funds from Origin's security interest, Markel asserts that it is entitled to those funds. Origin argues, however, that a trust was not created. Therefore, under the rules of priority between creditors, Origin holds the superior interest.

The Court concludes that a trust was not created because the language of the trust provision and the agreement as a whole demonstrate a lack of intent to create a trust, indicating instead an attempt to circumvent superior security interests. Because Origin's security interest is superior, the Court grants Origin's motion and denies Markel's motion.

1.  **Factual and Procedural Background**

The Lauren Corporation (Lauren Co.) was an independent, privately owned company based out of Abilene, Texas that provided "professional engineering and construction services across the United States." Dkt. No. 20 at 6. Lauren Co.'s "work encompassed projects across the power (including renewables), chemical and polymer, and oil and gas sectors." *Id.* Lauren Co. had several subsidiary companies, including Lauren Engineers and Constructors, Inc. (LEC) (collectively with Lauren Co., Lauren).

  A.  **Origin enters into a security agreement with Lauren, naming Lauren's accounts receivable as the collateral for the loan, and files financing statements in October 2013.**

On October 15, 2013, Lauren Co. and Origin Bancorp, Inc.[1] entered into the Letter Loan Agreement,[2] which provided the terms and conditions under which Origin agreed to loan money to Lauren Co. Dkt. No. 14 at 4. The Letter Loan Agreement allowed Lauren Co. to borrow from Origin "an amount [] equal to 80% of the net amount of certain eligible accounts" so long as "the total loan did not exceed in the aggregate of more than $20,000,000." *Id.* at 4–5, 8.

That same day, in connection with the Loan Agreement, Lauren Co. executed a promissory note in favor of Origin. *Id.* at 5. LEC also executed a Guaranty Agreement in which LEC guaranteed the obligations under the Loan Agreement. *Id.*

---

[1] Origin was formally known as Community Trust Bank. Dkt. No. 14 at 4.

[2] The Loan Agreement that Lauren Co. and Origin executed was amended several times. Dkt. No. 14 at 4, 29–78. The Letter Loan Agreement and the amendments are collectively referred to as the Loan Agreement.

On October 15, 2013, Origin, Lauren, and other Lauren subsidiary corporations entered into the Security Agreement. *Id.* at 5, 157–66. The Security Agreement purported to give Origin a security interest in all accounts receivable:

> All of Debtor's Accounts . . . now owned or existing, as well as any and all that may hereafter arise or be acquired by Debtor, and all the proceeds and products thereof, including without limitation, all notes, drafts, acceptances, instruments, and chattel paper arising therefrom, and all returned or repossessed goods arising from or relating to any such accounts, or other proceeds of any sale or other disposition of inventory or other property of debtor.

*Id.* at 157.

In an effort to perfect its interest in Lauren's present and after-acquired accounts receivable, on October 22, 2013, Origin filed UCC-1 Financing Statements with the Texas Secretary of State and the Delaware Department of State. *Id.* at 5, 171–77. The Financing Statements expressly cover Lauren's accounts receivable:

> Accounts. All accounts now owned or existing, as well as any and all that may hereafter arise or be acquired by [Lauren], and all the proceeds and products thereof, including without limitation, all notes, drafts, acceptances, instruments and chattel paper arising therefrom, and all returned or repossessed goods arising from or relating to any such accounts, or other proceeds of any sale or other disposition of inventory or other property of [Lauren].

*Id.* at 174.

Five years later, in August and October 2018, Origin filed continuation statements with both the Texas Secretary of State and the Delaware Department of State, respectively, to ensure that its interest in Lauren's accounts receivable would remain perfected for an additional five years. *Id.* at 179–83. Thus, Origin's interest in Lauren's accounts has allegedly remained perfected since its initial filing in October 2013. *See id.*

### B. Markel and Lauren enter into a general indemnity agreement in June 2018 so that Lauren can obtain surety bonds from Markel.

Given the nature of Lauren's projects, it was often required to obtain surety bonds in the form of bid, performance, payment, or maintenance bonds. Dkt. No. 20 at 6. To obtain these bonds, Lauren established a relationship with and sought surety bonds from Markel. *Id.*

On June 19, 2018, Lauren and other related individuals and entities executed a general agreement of indemnity (the GAI) in favor of Markel.[3] *Id.* at 10–18. The GAI sets forth various requirements for Lauren. *See id.* For instance, it requires that Lauren pay all premiums, fees, and other charges related to the bonds; cover all underwriting, inspection fund disbursement, escrow, special handling filing, recording, and similar fees; and pay interest on all unpaid indebtedness. *Id.* at 10–12.

Paragraph 9 of the GAI states that it "shall constitute a Security Agreement and a Financing Statement for the benefit of the Company in accordance with the Uniform Commercial Code and all similar statutes." *Id.* at 12. It provides that, "[a]s further security, [Lauren] hereby grant[s] to [Markel] a security interest in, and lien on, all of their . . . accounts receivable . . . due or to become due in connection with any contract, whether or not bonded by [Markel]." *Id.*

Critically here, paragraph 24 of the GAI purports to create a trust for Markel's benefit:

> Indemnitors declare that all monies due and to become due under any contract or contracts covered by Bonds issued by [Markel] are trust funds, whether in the possession of [Lauren] or otherwise, for the benefit of and for payment of all obligations for which [Markel] would be liable under any of said Bonds, and this Agreement shall constitute notice of such trust. Said trust also inures to

---

[3] Origin is not a party to the GAI. *See* Dkt. No. 20 at 10–18.

>the benefit of [Markel] for any liability or loss it may have or sustain under any of said Bonds, and this Agreement shall constitute notice of such trust.

*Id.* at 14.  Relying on the Indemnity Agreement, Markel issued payment and performance bonds for two of Lauren's construction projects (the Projects).  *Id.* at 7.

It was not until March 10, 2021—nearly three years after executing the GAI—that Markel filed a UCC-1 Financing Statement in Texas.  Dkt. No. 14 at 185–87.  The financing statement contains a long list of covered collateral, including "accounts receivable."  *Id.* at 185.

### C.     Following Lauren's default, Origin seizes the accounts receivable in Lauren's account.

In February 2020, the President and CEO of Lauren passed away.  Dkt. No. 20 at 7.  Shortly after, Lauren began suffering financial difficulties.  *Id.*  In January 2021, Lauren defaulted on its obligations under Loan Agreement.  Dkt. No. 14 at 5, 168–69.  Origin gave written notice to Lauren that it was in default, notifying Lauren that it would need to "enter[] into discussions with [Origin] as to the actual amount of weekly payments . . ., an immediate pay-down of the outstanding indebtedness, and the identification of additional collateral to be pledged to the [l]oan."  *Id.* at 168.  By March 8, 2021, Lauren had not cured the defaults, and the amount owed and unpaid on the loan was approximately $10,338,330.79.  *Id.* at 5.  Based on Lauren's existing default, Origin exercised its security rights according to the Loan Agreement and swept—or seized—the money in Lauren's accounts on several occasions between March 9, 2021 and April 5, 2021, to offset a portion of Lauren's debt.[4]  *Id.* at 5–6; *see id* at 21.  Lauren obtained a total of $2,343,722.22 from

---

[4] Origin objects to a portion of paragraph 9 of the Affidavit of Michael Cronin.  Dkt. No. 25 at 7.  Because the Court does not rely on that paragraph of the declaration in its analysis, the Court denies this objection as moot.

these sweeps (*id.* at 6), including a total of $1,383,156.54 of accounts receivable from the Projects. *Id.* at 8.

When Markel became aware of Origin's actions, Markel sent a letter to Origin, demanding that Origin return the $1,383,156.54 in accounts receivable from the Projects because that money was allegedly being held in trust by Lauren for the benefit of Markel.[5] *Id*. Nevertheless, Origin refused to give the funds to Markel. *Id*.

### D. Markel files suit, and the parties file cross-motions for summary judgment.

Lauren filed for Chapter 7 bankruptcy in April 2021. Bankr. Dkt. 1.[6] Markel filed a lawsuit against Origin in the Texas District Court in the 350th Judicial District in Taylor County, Texas. *Id.* at 1. Origin removed the case to the U.S. Bankruptcy Court for the Northern District of Texas, creating an adversary proceeding. *Id.* at 2. Markel then filed a motion seeking an "order withdrawing the reference to the United States Bankruptcy Court for the Northern District of Texas." Bankr. Dkt. No. 11; Dkt. No. 1-1 at 2. The bankruptcy court filed a Report and Recommendation in which it recommended that the Court grant Markel's Motion to Withdraw the Reference (Dkt. No. 2), and the Court did so (Dkt. No. 3). The parties then filed cross-motions for summary judgment. Dkt. Nos. 12; 17. The motions have been fully briefed and are ripe for review. *See* Dkt. Nos. 13; 19; 25; 27.

## 2. Standards of Review

Courts "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[5] Origin also objects to Exhibit A-2 (Dkt. No. 20 at 20–24). Dkt. No. 25 at 7. Again, because the Court does not rely on this letter in its analysis, the Court denies the objection as moot.

[6] This refers to the docket in *Markel Insurance Company v. Origin Bancorp, Inc.*, Adversary No. 21-01001-rlj, in the United States Bankruptcy Court for the Northern District of Texas, Abilene Division.

*Id.*  Movants must support their assertion that there is no genuine dispute as to any material fact by "citing to particular parts of materials in the record[] . . . or showing that the materials cited do not establish the . . . presence of a genuine dispute."  Fed. R. Civ. P. 56(c)(1)(A)–(B).  Courts must consider "the cited materials, but [they] . . . may consider other materials in the record."  Fed. R. Civ. P. 56(c)(1)(3).

In evaluating a motion under Rule 56, the Court must determine whether, after considering the evidence in the light most favorable to the nonmoving party, a rational jury could find in favor of that party.  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).  "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

The moving party bears the initial burden of providing the basis for its belief that there is no genuine issue for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has made that showing, the burden shifts to the nonmovant to establish that there is a genuine issue of material fact such that a reasonable jury might return a verdict in its favor.

If the party moving for summary judgment "bears the burden of proof on an issue, . . . he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor."  *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986); *see also Smith v. Ochsner Health Sys.*, 956 F.3d 681, 683 (5th Cir. 2020).  "[T]he non-movant must respond to the motion for summary judgment by setting forth particular

facts indicating that there is a genuine issue for trial." *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000).

3.   Analysis

   A.   **Origin holds a perfected interest in Lauren's accounts receivable and, thus, the funds.**

At the outset, the Court concludes that Origin held a perfected interest in Lauren's accounts receivable when it swept the funds, which had remained perfected since it initially filed its financing statement in October 2013. Markel does not contest that Origin holds a perfected interest in Lauren's accounts receivable. *See* Dkt. No. 19.

To show that it has a perfected security interest in collateral, a party must establish that its interest has attached to the collateral and the party has properly perfected its interest against other parties. Tex. Bus. & Comm. Code § 9.203; 6 Del. C. § 9-203.[7]

Attachment occurs once the security interest is enforceable against the debtor. Tex. Bus. & Comm. Code § 9.203(a). For a security interest to be enforceable against the debtor, three requirements must be satisfied: (1) there must be value given; (2) the debtor must have rights in the collateral; and (3) the debtor must have authenticated a security agreement with a description of the collateral. *Id.* § 9.203(b)(1)–(2). A security agreement can "create or

---

[7] Tex. Bus. & Comm. Code. § 1.301(a) expressly gives parties the power to choose what state's law applies. The security agreement between Origin and Lauren states that the law of Texas shall govern the Security Agreement. Dkt. No. 162. However, Tex. Bus. & Comm. Code § 9.301(1) states that "while a debtor is located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral." Comment 2 of Section 9.301(1) clarifies that "[t]his subpart does not address choice of law for other purposes[,] . . . such as attachment." Thus, Texas law governs attachment. The law governing perfection is the law where the debtor is located. Lauren Co. was incorporated in Texas, so Texas law governs perfection as to Lauren Co. However, LEC was incorporated in Delaware, so Delaware law governs perfection for the LEC. The Court notes, however, that the requirements for perfection are the same, and the same conclusion would be reached under both Texas and Delaware law: Origin had a perfected security interest in Lauren's accounts receivable.

provide for a security interest in after-acquired collateral," such as after-acquired accounts receivable, which will attach once the debtor acquires the collateral. *Id.* § 9.204(a), cmt. 2.

Here, Origin and Lauren executed the Security Agreement in October 2013. Dkt. No. 14 at 157–66. The Security Agreement granted Origin a security interest in all of Lauren's present and after-acquired accounts receivable as security for the loan Origin provided to Lauren. *Id.* at 157. Because (1) Origin provided a loan to Lauren, giving it value; (2) Lauren has rights in its accounts receivable; and (3) the Security Agreement was signed by Lauren and provided a description of the collateral, Origin's security interest in the accounts receivable attached. *See id.* at 157–66. Therefore, as soon as any funds were due for the services that Lauren had provided, Origin's security interest attached.

To perfect an interest in accounts receivable, the secured party must file with the proper office a financing statement that contains the names of the debtor and the secured party and generally describes the collateral. Tex. Bus. & Comm. Code §§ 9.310(a); 9.502; 6 Del. C. §§ 9.203(b)(1), (2), (3)(A). In both Delaware and Texas, the financing statement must be filed with the state where the debtor is incorporated. Tex. Bus. & Comm. Code §§ 9.310(a); 9.502; 6 Del. C. §§ 9.203(b)(1), (2), (3)(A). The financing statement perfects the creditor's security interest in the collateral for five years. Tex. Bus. & Com. Code § 9.515(a); 6 Del. C. § 9.515(a). To maintain a perfected interest in the collateral after the five-year period, the creditor must file a continuation statement within six months before the expiration of the five-year period, which continues the effectiveness of the financing statement for an additional five years beginning when the original financing statement would have become ineffective. Tex. Bus. & Comm. Code § 9.515(c)–(e); 6 Del. C. § 9.515(c)–(e).

Here, Origin filed financing statements with both the Texas Secretary of State and the Delaware Department of State that contains the names of the debtor and secured party and describes the collateral in October 2013.[8] Dkt. No. 14 at 171–77. Origin then timely filed continuation statements with both offices to continue its perfected security interest. *Id.* at 179–83. Thus, when Origin exercised its offset rights and swept Lauren's accounts in 2021, Origin had maintained a perfected security interest in the accounts receivable since October 2013.

> **B.   Origin's security interest in the accounts receivable is superior because it was perfected before Markel perfected its security interest.**

Origin's security interest takes priority over Markel's because Origin perfected its security interest before Markel did. Under both Texas and Delaware law, the "first in time, first in right" rule generally applies to perfected security interests. *See* Tex. Bus. & Comm. Code § 9.322(a); 6 Del. Code § 9-322(a).

Here, Origin maintained a perfected security interest in the accounts receivable since October 2013. *See supra* Section 3.B. Markel and Lauren's GAI, which operated as their security agreement, was not executed until June 2018. Dkt. No. 20 at 16. And Markel did not file a UCC-1 Financing Statement to perfect its security interest in Lauren's accounts receivable until March 2021. Dkt. No. 14 at 185–87. Therefore, because Origin had perfected its security interest prior to Markel, Origin's interest is superior.[9]

---

[8] Because Lauren Co. was incorporated in Texas, Origin filed a financing statement in Texas. And because LEC was incorporated in Delaware, Origin filed a financing statement in Delaware.

[9] Origin also states that Markel filed its financing statement in the wrong jurisdiction by filing in Texas as opposed to Delaware. Dkt. No. 13 at 13. However, because Lauren Co. was incorporated in Texas, Markel's financing statement filed with the Texas Secretary of State perfected its security interest as to Lauren Co.'s accounts receivable. *See* Dkt. No. 14 at 185–87. The record does not show that Markel filed a financing statement in Delaware. Nevertheless, any issue that this raises is

### C. The Indemnity Agreement between Markel and Lauren does not create a trust for the benefit of Markel.

Nevertheless, in an attempt to overcome Origin's superior security interest, Markel alleges that paragraph 24 of the GAI created a trust for the benefit of Markel with the accounts receivable as trust property. Dkt. Nos. 19 at 18–23; 20 at 17. If the bankrupt debtor holds property in a valid trust, that property is not part of the debtor's estate and thus not subject to creditors' security interests. *Begier v. IRS*, 496 U.S. 53, 59 (1990); *In re Sakowitz*, 949 F.2d 178, 181 (5th Cir. 1991). Therefore, Markel argues that it is the true legal owner of the funds, and Origin wrongfully seized them. Dkt. No. 19 at 17, 23–24. Origin counters that the paragraph merely uses generic, talismanic language in a failed attempt to circumvent the security interests of other creditors who have priority. Dkt. No. 13 at 15–20. For the reasons explained below, the Court agrees with Origin.

Markel alleges that the GAI created an express trust.[10] Dkt. No. 19 at 12–17. An express trust establishes "a fiduciary relationship with respect to property which arises as a manifestation by the settlor of an intention to create the relationship and which subjects the person holding title to the property to equitable duties to deal with the property for the benefit of another person." Tex. Prop. Code § 111.004(4). To establish an express trust under Texas law, the settlor must show an intent to create a trust. Tex. Prop. Code. § 112.002. Additionally, "the beneficiary, the res, and the trust purpose must be identified." *Perfect Union Lodge No. 10, A.F. & A.M. of San Antonio v. Interfirst Bank of San Antonio, N.A.*, 748 S.W.2d 218, 220 (Tex. 1988). Thus, in determining whether an express trust exists,

---

immaterial to Court's analysis. Even assuming that Markel's security interest was perfected as to both Lauren Co. and LEC, Origin perfected its security interest first.

[10] Markel does not argue that any other type of trust was created. *See* Dkt. No. 19 at 12–17. Its argument rests solely on the existence of an express trust. *See id.*

courts consider whether (1) the settlor's words are imperative and impose an obligation on the trustee; (2) the trust property is certain; and (3) the beneficiary is certain. *Pickelner v. Adler*, 229 S.W.3d 516, 526 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). "A fiduciary relationship is an extraordinary one and will not be lightly created." *Hoggett v. Brown*, 971 S.W.2d 472, 488 (Tex. App.—Houston [14th Dist.] 2007, pet. denied).

Courts determine whether a trust exists based on the trust instrument as a whole—not any alleged magic words. *See Pineda REO, LLC v. Weir Bros, Inc.*, No. 3:18-CV-1660-N, 2020 WL 1236548, at *7–8 (N.D. Tex. Mar. 12, 2020). "Technical words of expression . . . are not essential for the creation of a trust." *Perfect Union Lodge No. 10, A.F. & A.M., of San Antonio*, 748 S.W.2d at 220. However, the absence of key trust terms can be significant to the analysis because it can show that there was no clear intent to create a trust. *See Sarah v. Primarily Primates, Inc.*, 255 S.W.3d 132, 144–46 (Tex. App.—San Antonio, 2008, pet. denied). And "[m]ere formulaic recitations of trust language are insufficient to create an express trust." *Pineda*, 2020 WL 1236548, at *7 (citing *In re Sakowitz*, 949 F.2d at 181).

The Fifth Circuit has repeatedly warned against concluding that a trust exists based on mere talismanic language or labels. For instance, the Fifth Circuit stated in *Sakowitz* that "[i]t is well established that if a ritualistic incantation of trust language were deemed conclusive, it would be a simple matter for one creditor, at the expense of others, to circumvent the rules pertaining to the creation of bona fide security interests." 949 F.2d at 181 (internal quotation marks omitted). The Fifth Circuit explained that the words "held . . . in trust" did not "suffice to establish an express trust." *Id.* And in *Hart v. First National Bank of Birmingham*, the Fifth Circuit prohibited a party from overcoming the statute of limitations "by calling a transaction a trust," particularly where the features of the

agreement at issue indicated that it was not a trust instrument. 373 F.2d 202, 206 (5th Cir. 1967).

The Northern District of Texas has echoed the Fifth Circuit's concerns and found that a trust did not exist under circumstances nearly identical to those present here. *See Pineda*, 2020 WL 1236548, at *7–8. In *Pineda*, the court considered whether a general agreement of indemnity between a surety and a construction company created a trust for the benefit of the surety with "all funds due or to become due under any Contract covered by a Bond" as the trust property. *Id.* at *2, *7–8 (internal quotation marks omitted). The court noted that "[n]either the section advancing the trust theory nor any other section clearly designates a trustee or beneficiary—in fact, neither those terms nor 'grantor' are used at all." *Id.* at *8. The court "decline[d] to allow the parties to circumvent the priority schemes . . . by mere recitation of the words 'trust funds.'" *Id.*

Here, the alleged trust provision also uses generic, ritualistic language that indicates a lack of intent to create a trust and raises the same threat to creditor-priority rules. *See* Dkt. No. 20 at 14. In fact, Paragraph 24 almost mirrors the language of the trust provision in *Pineda*. The provision in *Pineda* stated:

> The [construction company] agree[s] and hereby expressly declare[s] that all funds due or to become due under any Contract covered by a Bond are Trust Funds, whether in the possession of [the construction company] or another, for the benefit and payment of all persons to whom the [the company] incurs obligations in the performance of a Contract for which [the surety] would be liable under the Bond and for the benefit of [the surety] for any liability or loss it may sustain or incur by reason of or in consequence of the execution of such Bonds.

2020 WL 1236548, at *7 n.15. Paragraph 24 provides:

> Indemnitors declare that all monies due and to become due under any contract or contracts covered by Bonds issued by [Markel] are trust funds, whether in the possession of [Lauren] or otherwise, for the benefit of and for payment of

– 13 –

> all obligations for which [Markel] would be liable under any of said Bonds, and this Agreement shall constitute notice of such trust. Said trust also inures to the benefit of [Markel] for any liability or loss it may have or sustain under any of said Bonds, and this Agreement shall constitute notice of such trust.

Dkt. No. 20 at 14. Paragraph 24 and the GAI have the same shortcomings as the general indemnity agreement and purported trust provision in *Pineda*. The terms "beneficiary" and "grantor" do not appear anywhere in the GAI. *Id.* at 10–18. And the term "trustee" is only used once in relation to the appointment of a receiver or trustee over Lauren; it does not name Lauren as a trustee. Dkt. No. 20 at 11. Instead, the talismanic language "trust funds" and "trust" appears to be used to allow Markel to circumvent Origin's superior security interest in Lauren's accounts receivable.

In addition to the precise trust language, courts consistently look to the contracts in their entirety to determine whether the parties intended to create a trust. In *Sakowitz*, for example, the Fifth Circuit examined whether the sublease at issue contained other provisions "that would be consistent with an express trust" or help "facilitate an effort to find a trust in a contract that is not facially a trust agreement." 949 F.2d at 182. For instance, "[a]mong any number of provisions that could be but are not present in the instant sublease—and that would tend to support a finding of an express trust—would be a provision prohibiting commingling of trust funds." *Id.* Moreover, other provisions demonstrated that the agreement had formed a lessor-lessee relationship, not a trustee-beneficiary one. *Id.* at 180, 182–83. Specifically, the alleged trustee was required to bear the credit risk and pay the alleged beneficiary, the alleged trustee had to pay the alleged beneficiary regardless of whether or not

customers had paid their bills, and the alleged beneficiary could not get the proceeds of its sales on demand.  *Id.* at 182–83.

Likewise, in *Pineda*, the court concluded that the general indemnity agreement there "suggests [] that the parties intended to create a creditor-debtor relationship and security interest but sought to bake in trust beneficiary protections by [the] use of the phrase 'trust funds.'"  2020 WL 1236548, at *8.  It explained that the agreement "ha[d] all the hallmarks of a security agreement rather than a trust."  For instance, the agreement was styled as an "agreement of indemnity" that purported to give the surety a grant of security interest in accounts receivable in exchange for surety bonds.  *Id.*  In addition, the surety's "ability to access the accounts receivable [was] only permitted upon the occurrence of an [e]vent of [d]efault."  *Id.*  Furthermore, the construction company would be liable to the surety "even in the absence of any accounts receivable—the alleged trust *res.*"  *Id.*  Moreover, throughout the agreement, the surety was referred to as the "secured party" with a "security interest," and the accounts receivable were referred to as "collateral."  *Id.*

Here, the GAI contains similar hallmarks of a security agreement.  The GAI is titled as an "Agreement of Indemnity" and even states that "this [a]greement shall constitute a Security Agreement and a Financing Statement for the benefit of the Company in accordance with the Uniform Commercial Code and all similar Statutes."  Dkt. No. 20 at 10, 12.  It grants Markel a security interest in various types of collateral, including Lauren's accounts receivable.  *Id.* at 12.  The GAI also provides that Lauren is liable to Markel for the payment of indemnity expenses, cash

collateral, or other collateral security "on demand," regardless of whether Lauren has any available accounts receivable. *Id.* at 10–11. In addition, the GAI lacks other provisions supporting a finding that the parties intended to create a trust. For instance, the GAI does not contain a provision prohibiting commingling of trust funds with other funds. *See Sakowitz*, 949 F.2d at 182. That appears to be especially important where, as here, the alleged trust property was "all monies due and to become due under any contract or contracts covered by [b]onds issued by the [surety]," not all of Lauren's accounts receivable. *See* Dkt. No. 20 at 14. For example, in *Hanover Insurance Company v. Oryx Oilfield Holdings, Inc.*, the general indemnity agreement contained such a provision requiring that the trust funds be deposited into a separate account to prevent commingling of trust funds with other funds. No. 4:18-CV-832-A, 2019 WL 6250852, at *2 (N.D. Tex. Nov. 22, 2019). But that is not the case here. *See* Dkt. No. 20 at 14.

And although Markel cites two other Texas district court cases and one Fifth Circuit case in which courts have found that a trust provision within a general indemnity agreement created a fiduciary relationship, these cases are distinguishable. None of them dealt with the existence of other creditors' superior security interests in the alleged trust property or the threat of using ritualistic language to circumvent those interests.[11] *See* Dkt. No. 19 at 13–14 (citing *Oryx*, 2019 WL 6250852, at *3;

---

[11] Markel also cites cases in other jurisdictions in which courts have found that a trust provision in a general indemnity agreement created a trust. Dkt. No. 19 at 13–17. But as Origin points out, cases in other jurisdictions have similarly found that a trust provision in a general indemnity agreement did not create a trust. Dkt. No. 25 at 10. In addition, with the exception of one Eastern District of Tennessee cases, none of the cases that Markel cites dealt with a situation where a creditor had a superior interest in the alleged trust property. *See* Dkt. No. 19 at 13–17; *see Selective Ins. Co. of Am. v. Env't, Safety & Health, Inc.*, No. 3:14-CV-531-TAV-CCS, 2015 WL 914824, at *8 (E.D. Tenn. Mar. 3, 2015). And even in other jurisdictions, there appears to be a general, echoing concern of

*Fidelity Deposit Co. of Md. v. PAR Constr., Inc.*, No. SA-2003-CA-0987-RF, 2004 WL 2537349, at *3 (W.D. Tex. Oct. 25, 2004); *In re Favre*, 342 F. App'x 5, 7 (5th Cir. 2009)). As the Fifth Circuit has counseled, "[w]here the relative rights of a bankrupt's creditors are at issue, it is particularly important that substance not give way to form." *Sakowitz*, 949 F.2d at 183.

In sum, the language of the trust provision and the rest of the GAI fail to create a genuine trust but are rather "nothing more than a draftsman's ineffectual effort to 'bootstrap' a bit of additional leverage" for the surety in light of Origin's prior, perfected interest. *See id*. The Court therefore finds that the GAI did not create an express trust.

> **D. Because Origin's security interest is superior, Markel's remaining claims fail, and summary judgment must be granted in favor of Origin.**

Markel brings forth claims of conversion, money had and received, and unjust enrichment and seeks a declaration that Markel is the legal owner of the accounts receivable. Dkt. No. 19 at 23–27. But because Origin's prior, perfected interest gives it priority over Markel, Markel's remaining claims fail as a matter of law.

First, Origin is not liable for conversion. "Conversion is the unauthorized and wrongful assumption and exercise of dominion and control over the personal property of

---

"prevent[ing[ parties in an essentially debtor-creditor relationship from invoking talismanic phraseology . . . solely as a means of protecting or securing the payment of a debt." *In re Prop. Leasing & Mgmt., Inc.*, 50 B.R. 804, 808–09 (Bankr. E.D. Tenn. May 23, 1985); s*ee, e.g.*, *In re Morales Travel Agency*, 667 F.2d, 1069, 1072 (1st Cir. 1981) ("If a ritualistic incantation of trust language were deemed conclusive, it would be a simple matter for one creditor, at the expense of others, to circumvent the rules pertaining to the creation of bona fide security interests."); *Lord's, Inc. v. Maley*, 356 F.2d 456, 459 (7th Cir. 1965) ("It appears that in the case before us, a 'trust' clause has been inserted into a document which otherwise sets up a simple debtor-creditor relationship in an effort to assure the debtor's performance of its obligation and not to create a trust.").

another to the exclusion of, or inconsistent with, the owner's rights." *Smith v. Maximum Racing, Inc.*, 136 S.W.3d 337, 341 (Tex. App.—Austin 2004, no pet.) (citing *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 447 (Tex. 1971)). To show that the defendant is liable for conversion, the plaintiff must show that (1) it "owned, had legal possession of, or was entitled to possession of the property"; (2) the defendant "assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with [the] plaintiff's rights" as the owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return the property. *Nolte v. Flournoy*, 348 S.W.3d 262, 269 (Tex. App.—Texarkana 2011, pet. denied). Here, however, Origin's sweep of the funds was authorized by the Security Agreement between it and Lauren. Dkt. No. 14 at 21. And Origin's security interest in Lauren's accounts receivable was superior to Markel's security interest. *See supra* Section 3.B. Therefore, Origin was entitled to possession of the property, not Markel.

Second, Origin is not liable for money had and received or unjust enrichment. "A claim for money had and received belongs conceptually to the doctrine of unjust enrichment." *Mary E. Bivins Found. v. Highland Cap. Mgmt. L.P.*, 451 S.W.3d 104, 112 (Tex. App.—Dallas 2014, no pet.) (internal quotation marks omitted). The elements for money had and received are "(1) the defendant holds money, and (2) the money in equity and good conscience belongs to the plaintiff." *Norhill Energy, LLC v. McDaniel*, 517 S.W.3d 910, 917 (Tex. App.—Fort Worth 2017, pet. denied) (citing *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 302 n.4 (Tex. 2015)). To receive restitution based on unjust enrichment, the plaintiff must show that the defendant "has obtained a benefit from another by fraud, duress, or the taking of an undue advantage." *Heldenfels Brothers, Inc. v. City of*

*Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). Here, because Origin has a superior interest in the accounts receivable, the accounts receivable in equity and good conscience belong to Origin, not Markel. *See supra* Section 3.B. In addition, because Origin's sweep of the funds was authorized by the Security Agreement, Origin did not receive a benefit through fraud, duress, or undue advantage. *See* Dkt. No. 14 at 21.

Third, Markel is not entitled to a declaratory judgment. "A declaratory-judgment action must be based on a valid underlying cause of action." *Hopkins v. Cornerstone Am.*, No. 4:05-CV-332-Y, 2009 WL 10721229, at *5 (N.D. Tex. June 15, 2009). As explained above, all of Markel's claims fail. Therefore, a declaratory judgment here is not proper.

4. **Conclusion**

Because Markel and Lauren's indemnity agreement did not create a trust and Origin's perfected security interest is superior to Markel's security interest, Markel's claims fail as a matter of law. Therefore, the Court grants summary judgment in favor of Origin and denies Markel's motion for summary judgment.

So ordered on March 21, 2023.

_____
JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE